**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDWARD WEYLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH EQUITY SERVICES, LLC D/B/A COMMONWEALTH FINANCIAL NETWORK,<br><br>Defendant. | Case No. 1:26-cv-12832<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Edward Weyler ("Plaintiff") brings this Class Action Complaint ("Complaint") against Commonwealth Equity Services, LLC d/b/a Commonwealth Financial Network ("Commonwealth" or "Defendant"), individually and on behalf of the Classes (defined below).[1]

## I. INTRODUCTION[2]

1. Plaintiff, a Commonwealth customer and Program Participant,[3] brings this action on behalf of himself and other Program Participants, to recover damages and to stop Commonwealth's unlawful conduct related to its Core Account Sweep Programs which, *inter alia*, involved: (1) Commonwealth failing to provide Program Participants with interest rates that tracked prevailing economic and business conditions and the market; (2) Commonwealth violating Program Participants' reasonable expectations to receive market based interest rates; and (3) Commonwealth prioritizing itself over its customers by taking the vast majority of the interest earned on Program Participants' cash for itself.

2. The Core Account Sweep Programs include the Bank Deposit Sweep Program ("BDSP") and Advisory Retirement Sweep Program ("ARSP") (collectively "Programs") through which Commonwealth automatically transfers free credit balances from its customers' investing accounts into interest-bearing deposit accounts selected by Commonwealth at other institutions, referred to as the "Program Banks."

---

[1] The allegations herein are based on personal knowledge as to Plaintiff's own conduct, and are made on information and belief as to all other matters, based on an investigation by counsel, which included a review of documents created and distributed by Defendant and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiff submits that discovery will further support the allegations in this Class Action Complaint ("Complaint").
[2] Unless otherwise noted, all emphases are added, all internal citations and quotations are omitted.
[3] "Program Participants" or "Participants" refers to Commonwealth customers enrolled in the Bank Deposit Sweep Program and/or the Advisory Retirement Sweep Program during the relevant period.

3. In its Sweep Program Disclosure (defined *infra*), Commonwealth informs customers that the Programs "are designed so that, based on economic circumstances, clients receive interest"[4] on their cash. Thus, the purpose of the Programs is for clients to earn interest on their cash.

4. Commonwealth also promises Participants that the "interest rates" earned via the Programs "will vary based upon prevailing economic and business conditions."[5]

5. Commonwealth further tells its customers that "[w]e believe you will benefit . . . financially from the rates of return on your cash sweep balances."[6]

6. But Commonwealth's promises ring hollow in light of how it structures, operates, and maintains the Programs to benefit itself at Participants' expense. In truth, over the past four years, contrary to Commonwealth's contractual, fiduciary, and common law obligations, as interest rates dramatically increased, Commonwealth used the Programs as a highly lucrative revenue stream and paid paltry, below-market interest rates to Program Participants. While Program Banks paid (and continue to pay) high, market-based interest rates on Program Participants' cash, Commonwealth passes along minuscule interest rates, wholly divorced from the market, to its customers and pockets the vast majority of the interest earned on Participants' cash for itself by taking a non-market-based fee.

7. Thus, while the purpose of the Programs is to provide Participants with interest on their cash, Commonwealth frustrates that purpose by using the Programs to generate massive

---

[4] *Commonwealth Financial Network® Core Account Sweep Programs (CASP[SM]) Disclosure Document* ("Sweep Program Disclosure") at 6, Commonwealth Financial (Dec. 6, 2024), https://assets.ctfassets.net/a320zjmb1inn/2dnz3VyerR3jV4i8ZSFEE5/411873171230e0985b5d2a6ee55879ec/OPS-4704-38721_Core_Account_Sweep_Program_10_24.pdf.

[5] *Id.* at 10.

[6] *Id.* at 7.

revenue for itself at the expense of its customers, many of whom were paid interest rates that never exceeded 0.75% over the past four years, despite the fact that interest rate benchmarks, including the Federal Funds Effective Rate ("EFFR" or "FFER") and the Federal Funds Target Rate ("FFTR") soared to a 15-year high, reaching 5.33% and 5.50% respectively.

8. And still today, cash in the Programs earns interest rates as low as 0.15% for the BDSP and 0.01% for the ARSP even as the EFFR remains at 3.63% and FFTR remains at 3.75%.

9. Rather than making good on its promises to Participants that they will financially benefit from the rates of return on their cash held in the Programs, Commonwealth uses the Programs to benefit itself at its customers' expense.

10. Because Commonwealth designed, implemented, and operated the Programs to benefit itself at the expense of its customers in violation of its fiduciary duty and express and implied promises, and acted unfairly and deceptively, Plaintiff, individually and on behalf of the Classes, brings this class action to enjoin Commonwealth's conduct and remedy the significant financial harm caused by Commonwealth to Program Participants. Plaintiff, individually and on behalf of the Classes, asserts claims against Commonwealth for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Massachusetts General Laws Chapter 93A, violation of the Kentucky Consumer Protection Act, KRS § 367.170, and unjust enrichment.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, Plaintiff is a citizen of a different

state than Defendant, and greater than two-thirds of the members of the Classes reside in states other than the state in which Defendant is a citizen.

12. This Court has personal jurisdiction over Defendant as Commonwealth is headquartered and maintains its principal place of business in Massachusetts. Commonwealth regularly and continuously conducts business within Massachusetts, maintains offices and employees within the Commonwealth, and has purposefully availed itself of the privilege of conducting business under the laws of Massachusetts.

13. Venue is appropriate within this District under 28 U.S.C. § 1391. At all relevant times, Defendant maintained its principal place of business in this District and engaged in a substantial portion of the activity at issue in this Complaint in this District.

14. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. Plaintiff

15. Plaintiff Edward Weyler is a citizen of Kentucky and resides in Anchorage, Kentucky.

16. Plaintiff Weyler has been a customer of Commonwealth since 2016. At all relevant times, Plaintiff Weyler maintained the following accounts with Commonwealth: (1) an Individual TOD advisory non-retirement account; and (2) two separate advisory Premiere Select IRAs.

17. At all relevant times, Plaintiff Weyler was enrolled in both the BDSP and the ARSP through which Commonwealth automatically swept his cash into deposit accounts with Program Banks. Specifically, cash in Plaintiff Weyler's Individual TOD advisory non-retirement account was swept into deposit accounts at Program Banks pursuant to the BDSP, and cash in Plaintiff

Weyler's Premiere Select IRA accounts was swept into deposit accounts at Program Banks pursuant to the ARSP.

18. At all relevant times, Plaintiff Weyler received interest payments from Commonwealth on his cash held in deposit accounts pursuant to the Programs. The following chart[7] shows the rates of interest Commonwealth provided to Plaintiff Weyler for cash held in Programs since January 2022 as compared to the FFER[8]:

| Date | Effective Federal Funds Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| Jan-22 | 0.08% | 0.01% | 0.01% |
| Feb-22 | 0.08% | 0.01% | 0.01% |
| Mar-22 | 0.33% | 0.01% | 0.01% |
| Apr-22 | 0.33% | 0.01% | 0.01% |
| May-22 | 0.83% | 0.01% | 0.21% |
| Jun-22 | 1.58% | 0.20% | 0.27% |
| Jul-22 | 2.32% | 0.25% | 0.58% |
| Aug-22 | 2.33% | 0.35% | 0.23% |
| Sep-22 | 3.08% | 0.35% | 0.40% |
| Oct-22 | 3.08% | 0.35% | 0.41% |
| Nov-22 | 3.83% | 0.50% | 1.95% |
| Dec-22 | 4.33% | 0.50% | 2.37% |
| Jan-23 | 4.33% | 0.50% | 2.18% |

[7] The Effective Federal Funds Rate reflects the monthly "end of period" rate as recorded by the Federal Reserve Bank of St. Louis. *See Effective Federal Funds Rate*, Federal Reserve Bank of St. Louis (last updated June 18, 2026), https://fred.stlouisfed.org/series/EFFR. The BDSP and ARSP rate reflects the actual rate recorded on Plaintiff Weyler's monthly statements. At all relevant times, save for three months, Plaintiff Weyler received a rate under the BDSP corresponding to its second tier because he held cash between $25,000 and $99,999. For the month of July 2022, Plaintiff Weyler held cash in excess of $100,000 but less than $249,999 and between June and July of 2023, Plaintiff Weyler held an amount of cash less than $25,000. He thus received an interest rate corresponding to tiers 3 and 1 during those respective periods.

[8] The EFFR is the actual, volume-weighted median rate at which banks lend to each other in the market and is calculated daily by the Federal Reserve Bank of New York. The Federal Reserve Bank of New York also conducts open market operations in order to keep the EFFR within the target range. Thus, EFFR is a backward-looking measure reflecting real economic and business conditions.

| Date | Effective Federal Funds Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| Feb-23 | 4.57% | 0.50% | 2.02% |
| Mar-23 | 4.83% | 0.75% | 2.22% |
| Apr-23 | 4.83% | 0.75% | 2.14% |
| May-23 | 5.08% | 0.75% | 2.10% |
| Jun-23 | 5.08% | 0.75% | 1.80% |
| Jul-23 | 5.33% | 0.75% | 1.97% |
| Aug-23 | 5.33% | 0.75% | 1.56% |
| Sep-23 | 5.33% | 0.75% | 1.62% |
| Oct-23 | 5.33% | 0.75% | 2.14% |
| Nov-23 | 5.33% | 0.75% | 1.63% |
| Dec-23 | 5.33% | 0.75% | 1.56% |
| Jan-24 | 5.33% | 0.75% | 1.41% |
| Feb-24 | 5.33% | 0.75% | 0.94% |
| Mar-24 | 5.33% | 0.75% | 0.68% |
| Apr-24 | 5.33% | 0.75% | 1.29% |
| May-24 | 5.33% | 0.75% | 0.57% |
| Jun-24 | 5.33% | 0.75% | 0.60% |
| Jul-24 | 5.33% | 0.75% | 0.51% |
| Aug-24 | 5.33% | 0.75% | 0.03% |
| Sep-24 | 4.83% | 0.75% | 0.01% |
| Oct-24 | 4.83% | 0.75% | 0.35% |
| Nov-24 | 4.58% | 0.75% | 0.35% |
| Dec-24 | 4.33% | 0.50% | 1.73% |
| Jan-25 | 4.33% | 0.50% | 1.30% |
| Feb-25 | 4.33% | 0.30% | 1.42% |
| Mar-25 | 4.33% | 0.30% | 0.96% |
| Apr-25 | 4.33% | 0.30% | 1.57% |
| May-25 | 4.33% | 0.30% | 0.43% |
| Jun-25 | 4.33% | 0.30% | 0.39% |
| Jul-25 | 4.33% | 0.30% | 0.54% |
| Aug-25 | 4.33% | 0.30% | 0.07% |
| Sep-25 | 4.09% | 0.25% | 0.01% |
| Oct-25 | 3.86% | 0.25% | 0.09% |
| Nov-25 | 3.89% | 0.20% | 1.05% |
| Dec-25 | 3.64% | 0.15% | 0.66% |
| Jan-26 | 3.64% | 0.15% | 0.37% |

| Date | Effective Federal Funds Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| Feb-26 | 3.64% | 0.15% | 0.01% |
| Mar-26 | 3.64% | 0.15% | 0.65% |
| Apr-26 | 3.64% | 0.15% | 0.55% |
| May-26 | 3.62% | 0.15% | 0.01% |

19. The following chart shows the rates of interest Commonwealth provided to Plaintiff Weyler for cash held as part of the Programs since January 2022 as compared to the FFTR.[9]

| Date | Federal Funds Target Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| Jan-22 | 0.25% | 0.01% | 0.01% |
| Feb-22 | 0.25% | 0.01% | 0.01% |
| Mar-22 | 0.50% | 0.01% | 0.01% |
| Apr-22 | 0.50% | 0.01% | 0.01% |
| May-22 | 1.00% | 0.01% | 0.21% |
| Jun-22 | 1.75% | 0.20% | 0.27% |
| Jul-22 | 2.50% | 0.25% | 0.58% |
| Aug-22 | 2.50% | 0.35% | 0.23% |
| Sep-22 | 3.25% | 0.35% | 0.40% |
| Oct-22 | 3.25% | 0.35% | 0.41% |
| Nov-22 | 4.00% | 0.50% | 1.95% |
| Dec-22 | 4.50% | 0.50% | 2.37% |
| Jan-23 | 4.50% | 0.50% | 2.18% |
| Feb-23 | 4.75% | 0.50% | 2.02% |
| Mar-23 | 5.00% | 0.75% | 2.22% |
| Apr-23 | 5.00% | 0.75% | 2.14% |
| May-23 | 5.25% | 0.75% | 2.10% |

[9] The FFTR is the policy band set by the Federal Reserve's Open Market Committee and represents the target range for overnight interbank lending rates. Thus, the FFTR is a forward-looking policy tool which influences economic and business. The FFTR data reflected here is the monthly "end of period" rate as recorded by the Federal Reserve Bank of St. Louis. *See Federal Funds Target Range - Upper Limit*, Federal Reserve Bank of St. Louis (last updated June 18, 2026), https://fred.stlouisfed.org/series/DFEDTARU.

| Date | Federal Funds Target Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| Jun-23 | 5.25% | 0.75% | 1.80% |
| Jul-23 | 5.50% | 0.75% | 1.97% |
| Aug-23 | 5.50% | 0.75% | 1.56% |
| Sep-23 | 5.50% | 0.75% | 1.62% |
| Oct-23 | 5.50% | 0.75% | 2.14% |
| Nov-23 | 5.50% | 0.75% | 1.63% |
| Dec-23 | 5.50% | 0.75% | 1.56% |
| Jan-24 | 5.50% | 0.75% | 1.41% |
| Feb-24 | 5.50% | 0.75% | 0.94% |
| Mar-24 | 5.50% | 0.75% | 0.68% |
| Apr-24 | 5.50% | 0.75% | 1.29% |
| May-24 | 5.50% | 0.75% | 0.57% |
| Jun-24 | 5.50% | 0.75% | 0.60% |
| Jul-24 | 5.50% | 0.75% | 0.51% |
| Aug-24 | 5.50% | 0.75% | 0.03% |
| Sep-24 | 5.00% | 0.75% | 0.01% |
| Oct-24 | 5.00% | 0.75% | 0.35% |
| Nov-24 | 4.75% | 0.75% | 0.35% |
| Dec-24 | 4.50% | 0.50% | 1.73% |
| Jan-25 | 4.50% | 0.50% | 1.30% |
| Feb-25 | 4.50% | 0.30% | 1.42% |
| Mar-25 | 4.50% | 0.30% | 0.96% |
| Apr-25 | 4.50% | 0.30% | 1.57% |
| May-25 | 4.50% | 0.30% | 0.43% |
| Jun-25 | 4.50% | 0.30% | 0.39% |
| Jul-25 | 4.50% | 0.30% | 0.54% |
| Aug-25 | 4.50% | 0.30% | 0.07% |
| Sep-25 | 4.25% | 0.25% | 0.01% |
| Oct-25 | 4.00% | 0.25% | 0.09% |
| Nov-25 | 4.00% | 0.20% | 1.05% |
| Dec-25 | 3.75% | 0.15% | 0.66% |
| Jan-26 | 3.75% | 0.15% | 0.37% |
| Feb-26 | 3.75% | 0.15% | 0.01% |
| Mar-26 | 3.75% | 0.15% | 0.65% |
| Apr-26 | 3.75% | 0.15% | 0.55% |

| Date | Federal Funds Target Rate | Plaintiff Weyler's BDSP Rate | Plaintiff Weyler's ARSP Rate |
|---|---|---|---|
| May-26 | 3.75% | 0.15% | 0.01% |

**B. Defendant**

20. Commonwealth Equity Services, LLC d/b/a Commonwealth Financial Network is a Massachusetts limited liability company organized under the laws of the Commonwealth of Massachusetts with its headquarters located in Waltham, Massachusetts.

21. Commonwealth manages over $300 billion in client assets.

22. All of Commonwealth's officers are located in Waltham, Massachusetts and all decisions, pertaining to the Programs and otherwise, are made in Waltham, Massachusetts, including the drafting of all relevant agreements and the Programs' operational, executive, administrative and policymaking decisions.

23. Commonwealth Equity Services, Inc. converted to Commonwealth Equity Services, LLC on August 1, 2017.

24. Defendant's sole member, 1979 Holding Company, LLC, is a limited liability company organized under the laws of the State of Delaware. Any operational functions of 1979 Holding Company, LLC are conducted in Waltham, Massachusetts.

25. In 2025, LPL Financial Holdings Inc. purchased and currently owns 1979 Holding Company LLC. LPL Financial Holdings Inc. is incorporated in Delaware and maintains its headquarters in California.

## IV. FACTUAL ALLEGATIONS

26. Commonwealth is a broker-dealer and investment advisor registered with the SEC and FINRA, which offers investment accounts to customers throughout the United States. Commonwealth manages over $300 billion in client assets.[10]

27. Commonwealth operates through a network of more than 2,000 independent financial advisors nationwide, to whom it offers support, including investment platforms, a software platform, and technological support, marketing, and research. In return, Commonwealth receives a portion of the revenue collected by the independent financial advisors from advisory and management fees. Commonwealth offers a number of financial products and services to investors, including brokerage accounts and investment advisory services. Brokerage accounts are securities accounts that allow customers to trade mutual funds, stocks, and other securities.

28. In its capacity as an investment advisor, Commonwealth offers a suite of investment advisory services and programs, consisting of Commonwealth's suite of Preferred Portfolio Services® programs, wealth management, and retirement consulting services, and advisory services programs available through third-party asset managers.

29. Upon opening investing accounts with Commonwealth, customers enter into written agreements with Commonwealth. Commonwealth owes contractual duties to its customers arising out of these contractual agreements as defined by the Customer Agreement, Preferred Portfolio Services® Custom Client Agreement, Premiere Select® Retirement Account Customer

---

[10] *Investor Disclosure Brochure*, Commonwealth (April 2026), https://assets.ctfassets.net/a320zjmb1inn/7r5889vHA5nwGDf3NsCmK7/3b97cc9d0cea94ba36ab2a13723fba17/Investor_Disclosure_Brochure_4.26.pdf; *see also LPL Financial Closes Its Acquisition of Commonwealth Financial Network*, Commonwealth (Aug. 1, 2025), https://www.commonwealth.com/insights/press-and-news/press-releases/lpl-financial-closes-its-acquisition-of-commonwealth-financial-network.

Agreement, the Commonwealth Financial Network® Core Account Sweep Programs (CASP$^{SM}$) Disclosure Document ("Sweep Program Disclosure")[11] and the Investor Disclosure Brochure (collectively "Account Agreements").

30. The Account Agreements state that the agreements are governed by the law of the Commonwealth of Massachusetts.

### A. Commonwealth's Sweep Programs

31. Commonwealth provides its customers—including both customers with brokerage accounts and advisory accounts (which includes those Commonwealth customers who use Commonwealth's network of independent financial advisors)—the Programs to sweep their free credit balances. A sweep program is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product . . . or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 C.F.R. § 240.15c3-3(a)(17) (2025).

32. Commonwealth exercises its unilateral discretion to select and operate the sweep Programs available to its customers,[12] including Plaintiff and members of the Classes. The Sweep Program Disclosure makes clear that Commonwealth can change or modify the Programs at any time provided Commonwealth provides enough notice. Rather than exercising this discretion to benefit Plaintiff and the members of the Classes, Commonwealth abuses its discretion in the operation of the Programs to benefit itself.

---

[11] The Sweep Program Disclosure is expressly referenced by the Customer Agreement and Preferred Portfolio Services® Custom Client Agreement.
[12] Sweep Program Disclosure at 2.

33. At all relevant times, Commonwealth operated two sweep Programs: the BDSP and ARSP.

34. While eligibility, interest rates and fees for the Programs differ, the Programs are broadly available to Commonwealth's customers. According to Commonwealth, "[a]ll accounts other than Keogh accounts, Section 457 plans, and accounts with a non-U.S. mailing address are eligible for either BDSP or ARSP."[13]

35. Both the BDSP and ARSP are subject to the Sweep Program Disclosure, which contains uniform representations about, *inter alia*, how the Programs function.

36. Under the Programs, free credit balances in the Participants' investment accounts are automatically swept into interest-bearing deposit accounts at one or more Program Banks. Once the cash is "swept to a Program Bank, it is referred to as [the customer's] 'Program Deposit.'"[14] Interest accrues daily and compounds monthly on Program Deposits.

37. While "[t]he rate of return varies between BDSP and ARSP . . . balances within each Program will earn the same rate of interest."[15]

38. Commonwealth also earns advisory fees on the Program Deposits in the BDSP and the ARSP:

> Cash balances in the Programs are also included in the value of account assets used to calculate the management fees and other asset-based fees we charge to your PPS advisory accounts. This means that Commonwealth earns advisory fees and [BDSP & ARSP] fees on the same cash balances in your PPS advisory account.[16]

[13] *Id.* at 11.
[14] *Id.* at 13.
[15] *Id.* at 5.
[16] *Id.* at 28.

39. Once enrolled in the Programs, customers rely on Commonwealth to negotiate and determine the interest rates they receive on their swept cash and to open the deposit accounts where the cash should be held at the Program Banks.

**1. The Bank Deposit Sweep Program**

40. The BDSP is the designated "core account investment vehicle for eligible brokerage accounts and advisory non-retirement accounts."[17] Commonwealth provides that the BDSP is available to those "acting for themselves or through an agent or fiduciary, whether having a single account, or joint account, and trust accounts . . . and sole proprietorships."[18]

41. Under the BDSP, cash in eligible accounts is automatically transferred to deposit accounts at Program Banks. Commonwealth customers earn interest on the cash placed in deposit accounts through the BDSP.

42. The interest rates applicable to the BDSP program are tiered based on the amount of Program Deposits. At all relevant times, Commonwealth used the following seven tiers: (1) $0 – $24,999; (2) $25,000 – $99,999; (3) $100,000 – $249,999; (4) $250,000 – $499,999; (5) $500,000 – $999,999; (6) $1,000,000 – $1,999,999; and (7) $2,000,000 or more. Generally, Commonwealth has provided higher interest rates on Program Deposits to customers with larger amounts of cash in the BDSP.

43. For example, today, Commonwealth provides a different interest rate to customers in each balance range tier, with the lowest Program Deposit balances (under $25,000) receiving a 0.05% interest rate and the highest Program Deposit balances ($2 million and more) receiving a 1.75% interest rate on swept cash:

[17] *Id.* at 1.
[18] *Id.* at 12.

**Bank Deposit Sweep Program Interest Rates as of May 8, 2026.**

| Bank Account Balance Range | Interest Rate | APY |
|---|---|---|
| $0–$24,999 | 0.05% | 0.05% |
| $25,000–$99,999 | 0.15% | 0.15% |
| $100,000–$249,999 | 0.25% | 0.25% |
| $250,000–$499,999 | 0.45% | 0.45% |
| $500,000–$999,999 | 0.75% | 0.75% |
| $1,000,000–$1,999,999 | 1.25% | 1.25% |
| $2,000,000 or more | 1.75% | 1.76% |

44. Program Banks pay interest on the balances held in deposit accounts pursuant to the BDSP. Upon information and belief, Program Banks pay interest rates on the Program Deposits based on economic and business conditions and the market. Moreover, upon information and belief, Program Banks pay interest rates on the Programs Deposits in excess of the EFFR and/or FFTR.

45. Commonwealth's Programs are administered by IntraFi Network LLC, a financial services company which facilitates its clients' deposits across a network of Program Banks. By spreading the deposits between these network banks up to the FDIC limit, IntraFi creates a competitive market for swept cash.

46. Brokerage firms such as Commonwealth benefit from IntraFi's vast network of Program Banks, which pay interest rates on Program Deposits based on market conditions. In return, Program Banks secure wholesale funding.[19]

47. Before any interest reaches Commonwealth's customers, it is reduced by fees flowing to Commonwealth, IntraFi , and a clearing broker (National Financial Services LLC).

### 2. The Advisory Retirement Sweep Program

48. Only advisory individual retirement accounts are eligible for the ARSP. Specifically, "ARSP is available only to the following advisory individual retirement accounts: the Premiere Select IRA, Premiere Select Roth IRA, Premiere Select SEP IRA, and Premiere Select SIMPLE IRA, if each beneficial owner is an ARSP Eligible Person."[20]

49. Under the ARSP, cash in eligible accounts is automatically transferred to deposit accounts at Program Banks. Commonwealth customers earn interest on the cash placed in deposit accounts through the ARSP.

50. All accounts enrolled in the ARSP were provided with a flat interest rate regardless of the amount of client's Program Deposits.

51. For example, the interest rate in effect for the ARSP today, regardless of Program Deposits, is 0.01%.

52. Program Banks pay interest on the balances held in deposit accounts pursuant to the ARSP. Upon information and belief, Program Banks pay interest rates on the Program Deposit accounts based on economic and business conditions and the market. Moreover, upon information

---

[19] *The Leading Deposit Sweep Service*, IntraFi, https://www.intrafi.com/intrafi-sweep (last visited June 18, 2026).
[20] Sweep Program Disclosure at 12.

and belief, Program Banks pay interest rates on the Programs Deposits that match or exceed the EFFR and/or FFTR.

53. For both the BDSP and ARSP, the fees Commonwealth receives are collected ***in addition*** to those assessed under other aspects of the customer's relationship to Commonwealth.

54. Amounts held in deposit accounts pursuant to the Programs may be included as part of the basis to calculate additional fees that Commonwealth receives.

55. Indeed, Commonwealth states that:

> In addition to the Program Fees referenced above, your account is charged additional fees that apply to the Investment Accounts maintained by you.
>
> . . .
>
> In addition to the fees paid to Commonwealth by the participating Program Banks, cash balances you maintain in the Programs are included in the value of account assets used to calculate the management fees and other asset-based fees we charge to your Preferred Portfolio Services® (PPS) advisory accounts.[21]

### B. Commonwealth's Contractual Duties to its Customers

#### 1. The Account Agreements Impose Express and Implied Duties to Provide Interest Rates Based Upon Prevailing Economic and Business Conditions and the Market

56. The Account Agreements describe Commonwealth's relationship with customers for the purpose of operating the BDSP and ARSP.

57. The Sweep Program Disclosure explicitly tells customers that "[t]he Programs are designed so that, ***based on economic circumstances, clients receive interest on Program Deposits***."[22]

58. Moreover, Commonwealth promises in the Sweep Program Disclosure that the Programs' ***interest rates "will vary based upon prevailing economic and business conditions."***[23]

[21] *Id.* at 6, 29-30.
[22] *Id.* at 6.
[23] *Id.* at 10.

59. Moreover, the Sweep Program Disclosure expressly links the Programs' interest rates to the market by basing the interest on the amounts the Program Banks earn and pay. Indeed, the interest rates promised by Commonwealth are, in part, "determined by the amount of aggregate interest the Program Banks pay."[24] That amount, in turn, is based on the Program Banks's ***market-based investment*** of the Program Deposits:

> The economic structure of the Programs are as follows. In both Programs, Program Banks participating in the Programs ***will invest the bank account deposits*** but will credit your bank account with an interest rate that is less than what the bank earns on its investments.[25]

60. The BDSP-specific interest rate provision also provides that "[i]nterest rates and Program Deposits may change at any time and ***are based on a number of factors, including general economic, market, and business conditions.***"[26]

61. Similarly, with respect to the BDSP, the Sweep Program Disclosure provides that Commonwealth "raise[s] or reduce[s] fees and var[ies] the amount of the reductions between clients ***based on market conditions***."[27]

62. With regard to the ARSP, the Sweep Program Disclosure provides that "[s]everal factors influence your actual rate, including the interest rates paid by the Program Banks, which are ***typically benchmarked to the Federal Funds Effective Rate ("FFER")***.[28]

63. The Sweep Program Disclosure also provides that Commonwealth's ARSP fee is "based on factors such as the FFER."[29]

---

[24] *Id*. at 9.
[25] *Id*. at 7.
[26] *Id*. at 23.
[27] *Id*. at 27.
[28] *Id*. at 28.
[29] *Id*.

64. Because the Sweep Program Disclosure expressly promised to provide interest rates that would "vary based upon prevailing economic and business conditions,"[30] Commonwealth had an obligation to provide interest rates under the Programs that tracked these conditions.

65. Further, under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract and prevents one party from acting in a manner that frustrates the purpose of the contract or violates the other party's reasonable expectations under the contract.

66. By entering into the Sweep Program Disclosure with Plaintiff and Class members, Commonwealth established a covenant of good faith and fair dealing.

67. Because Commonwealth (1) stated that the Programs were designed to provide interest to customers, (2) told customers that the interest earned in the Programs would benefit customers financially, (3) promised that the interest rate provided "will vary based on prevailing economic and business conditions" and (4) told customers that interest rates would be impacted by such conditions as the FFER, Plaintiff and similarly situated Commonwealth customers had a reasonable expectation that Commonwealth would provide interest on their swept cash that would track the market.[31]

**2. Commonwealth Owes Plaintiff and Members of the BDSP and ARSP Advisory Sub-Classes a Fiduciary Duty**

68. Both the BDSP and the ARSP are available to individuals who have advisory accounts with Commonwealth. The BDSP is available to "advisory non-retirement accounts" while the ARSP is available to "advisory retirement account[s]."[32]

69. Plaintiff Weyler holds advisory accounts enrolled in both the BDSP and the ARSP.

[30] *Id.* at 10.
[31] *Id.*
[32] *Id.* at 7.

70. Commonwealth provides an Investor Disclosure Brochure to inform its customers about the services it offers and its relationship to its customers.[33]

71. In the Investor Disclosure Brochure, Commonwealth promises Plaintiff and the Advisory Sub-Classes, under the heading "Investment Adviser Capacity," that "[w]hen we act as an investment adviser to you, we have a fiduciary relationship with you under the Investment Advisers Act of 1940."[34]

72. Accordingly, Plaintiff and the Advisory Sub-Classes entrusted these fiduciary duties to Commonwealth in its capacity as an adviser in the exercise of complete control and discretion over the Programs and its clients' funds. In entering into the Account Agreements, Commonwealth assumed these fiduciary duties of loyalty, care, and to act in the best interests of its clients.

### C. The Programs Fail to Pay Interest Rates Based on Prevailing Economic and Business Conditions and the Market

73. Despite its contractual and common law duties to act in its customers' best interest and provide an interest rate based on prevailing economic and business conditions and the market, Commonwealth fails to pay or secure a market-based rate of interest for the Programs.

74. Specifically, since 2022, the interest rates Commonwealth paid or secured for cash deposits in the Programs have been consistently low and untethered to "prevailing economic and business conditions" and the market.[35]

---

[33] *Investor Disclosure Brochure*, Commonwealth (April 2026), https://assets.ctfassets.net/a320zjmb1inn/7r5889vHA5nwGDf3NsCmK7/3b97cc9d0cea94ba36ab2a13723fba17/Investor_Disclosure_Brochure_4.26.pdf.

[34] *Id.* at 3. Identical language exists in prior iterations of the Investor Disclosure Brochure dating back to June 17, 2020.

[35] Sweep Program Disclosure at 10.

75. The Federal Reserve benchmark rates, including FFER and FFTR, reflect prevailing economic and business conditions and the market. The Federal Reserve's Open Market Committee ("FOMC")—responsible for setting the United States' monetary policy—has a dual mandate of promoting maximum employment and low inflation in the economy. The Federal Funds rate(s) are tools used by the FOMC to realize that mandate.

76. To that end, the Federal Funds Target Rate ("FFTR") is the policy band set by the FOMC and represents the target range for overnight interbank lending, while FFER is the actual rate at which banks lend to each other. The Federal Funds Rate(s) are thus policy tools which both reflect and influence economic and business conditions. Indeed, as the Federal Reserve explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."[36]

77. However, Commonwealth's interest rates have neither varied with nor been based upon such prevailing economic and business conditions and the market. Beginning in early 2022, the FFER began to climb eventually reaching 5.33%—its highest point in nearly two decades.[37] Likewise, the FFTR rose to its high of 5.5% by August of 2023.[38] As these rates increased, Commonwealth failed to offer commensurate interest rate increases to Plaintiff and the Class Members enrolled in the Programs.

[36] *Economy at a Glance - Policy Rate*, Federal Reserve (last updated Apr. 29, 2026), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.
[37] *Effective Federal Funds Rate*, Federal Reserve Bank of St. Louis (last updated June 12, 2026), https://fred.stlouisfed.org/series/EFFR.
[38] *Federal Funds Target Range - Upper Limit*, Federal Reserve Bank of St. Louis (last updated June 18, 2026), https://fred.stlouisfed.org/series/DFEDTARU.

78. Indeed, the interest rates Commonwealth customers received under the BDSP and ARSP neither varied with nor were based upon prevailing economic and business conditions, and the market, such as the FFER[39]:




79. As Figure One indicates, the Programs' interest rates remained largely stagnant compared to the skyrocketing FFER, failing to vary with or reflect prevailing economic and business conditions and the market.

80. Indeed, from March 2022 to November 2025, the FFER moved in an upward direction thirteen times whereas Plaintiff Weyler's BDSP interest rate moved in an upward direction just five times. *See supra* ¶ 18. Moreover, even when Commonwealth moved the BDSP interest rate in an upward direction, it was still a significantly lower rate than the FFER and thus did not reflect prevailing economic and business conditions and the market. The below chart reflects the times the FFER moved in an upward direction between March 2022 and November 2025 and Plaintiff Weyler's corresponding BDSP rate.

[39] *See* note 7, *supra*.

| **Date** | **Effective Federal Funds Rate** | **Plaintiff Weyler's BDSP Rate[40]** |
|---|---|---|
| Feb-22 | 0.08% | 0.01% |
| Mar-22 | 0.33% | 0.01% |
| May-22 | 0.83% | 0.01% |
| Jun-22 | 1.58% | 0.20% |
| Jul-22 | 2.32% | 0.25% |
| Aug-22 | 2.33% | 0.35% |
| Sep-22 | 3.08% | 0.35% |
| Nov-22 | 3.83% | 0.50% |
| Dec-22 | 4.33% | 0.50% |
| Feb-23 | 4.57% | 0.50% |
| Mar-23 | 4.83% | 0.75% |
| May-23 | 5.08% | 0.75% |
| Jul-23 | 5.33% | 0.75% |
| Oct-25 | 3.86% | 0.25% |
| Nov-25 | 3.89% | 0.20% |

81. In contrast to the BDSP rates not tracking each time the EFFR moved in an upward direction, when the EFFR began to decrease in the Fall of 2024, Commonwealth took advantage of this situation to further lower Plaintiff Weyler's already paltry and non-market based BDSP rates even further, lowering from Plaintiff's BDSP rate from .75% to .5%, .25% and .15% while the EFFR remained high between 3.86% and 5.33%. In February of 2025, even as the FFER did not move, Plaintiff Weyler's BDSP rate was dropped from 0.50% to 0.30%. *See supra* ¶ 18.

82. Plaintiff Weyler's BDSP rates remained strikingly lower than the FFER rates at all times during the relevant period, including from March 2022 through May 2026, further

[40] Plaintiff Weyler was primarily in tier 2 of the BDSP during the relevant time period with three exceptions. Specifically, in July 2022 he was in tier 3 and June 2023 and July 2023 he was in tier 1. Accordingly, to fully confirm whether any impact on Plaintiff Weyler's BDSP rates was from his changing tiers in these months or from Commonwealth moving BDSP rates, discovery is required.

demonstrating that BDSP rates failed to track prevailing economic and business conditions and the market. *See supra* ¶ 18.

83. Indeed, from the time the FFER began to increase to historic highs in March 2022 to when it began to decrease in September 2024, Plaintiff Weyler's BDSP interest rate only moved from a low of 0.01% to a high of 0.75% and thus BDSP interest rates were largely static during the time when the FFER was rapidly increasing from 0.08% to a peak of 5.33%.

84. ARSP interest rates similarly failed to vary with or reflect prevailing economic and business conditions and the market. Specifically, while the FFER moved in an upward direction thirteen times between March 2022 and November 2025, the ARSP rate moved in an upward direction only eight times. Worse still, there were four times the ARSP interest rate ***moved down when the FFER rate increased***. In other words, despite a rising FFER, ARSP Participants received declining rates of interest. *See supra* ¶ 18.

85. While the ARSP rates did not vary with or track each time the FFER moved in an upward direction, when the FFER began to decrease in the Fall of 2024, Commonwealth took advantage of this situation to further lower the already paltry and non-market based ARSP rates even further, decreasing to as low as .01%. As with BDSP rates, ARSP rates remained strikingly lower than the FFER rates at all times during the relevant period including through May 2026. *See supra* ¶ 18.

86. And, from the time the FFER began to increase in March 2022 to when it began to decrease in September 2024, the ARSP interest rate only moved from 0.01% to 2.37% and thus ARSP interest rates were largely static during the time when the FFER was rapidly increasing from 0.08% to a peak of 5.33%.

87. Ultimately, since 2022, the FFER soared from a low of 0.08% to a high of 5.33% in 2024. Yet, as these rates were climbing, Commonwealth failed to provide interest rates to Program Participants that varied with or tracked economic and business conditions. Today, while the current FFER rates is approximately 3.63%, Plaintiff receives only 0.15% interest on cash held in the BDSP and 0.01% interest on cash held in the ARSP and even Commonwealth customers with the highest cash balances—in excess of $2,000,000—receive only 1.75% in interest on funds in the BDSP.

88. Similarly, the Programs' interest rates do not vary with or track the FFTR and are consistently substantially lower than the FFTR as shown below:




89. As this chart indicates, Plaintiff Weyler's interest rate in the Programs trailed far below the FFTR and failed to move in the same manner as the skyrocketing FFTR.

Further, the Programs' interest rates do not follow, and are consistently hundreds of basis points below the market for short term U.S. Treasury Rates. For example, the 1-Month U.S. Treasury Rate on June 18, 2026 was 3.69% compared to Commonwealth's rates which were as low as

0.05% for the BDSP and 0.01% for the ARSP. The chart below compares the return Plaintiff Weyler received on his swept cash with the 1-Month U.S. Treasury rate from January 2022 to present:




90. As Figure Two indicates, the 1-Month U.S. Treasury rate vastly exceeded the interest rate Plaintiff Weyler received on funds, reaching 25 times higher than the rate provided to Plaintiff Weyler under the BDSP and 500 times higher than his interest rate under the ARSP. [41]

91. The rates offered through the Programs are also significantly lower than Commonwealth's market competitors.

92. For example, the following chart compares the rates Program Participants receive from the Programs, as of June 18, 2026, with those of a comparable sweep program:

| BDSP | ARSP | Vanguard |
|---|---|---|
| 0.05% (Tier 1) | 0.01% | 3.35% |

[41] The 1-Month U.S. Treasury rate reflects the monthly 'end of period' yield as recorded by the Federal Reserve Bank of St. Louis. *See Market Yield on U.S. Treasury Securities at 1-Month Constant Maturity, Quoted on an Investment Basis*, Federal Reserve Bank of St. Louis (last updated June 18, 2026), https://fred.stlouisfed.org/series/DGS1MO#. The BDSP and ARSP rate reflects the actual rate recorded on Plaintiff Weyler's monthly statements. *See supra* note 7.

93. Thus, other financial institutions that use sweep programs pay or secure significantly higher rates than Commonwealth—in some instances, ***even more than 335 times higher***.

94. Ultimately, rather than structuring the Programs to financially benefit Plaintiff and members of the Classes and basing the Programs' interest rates on economic and business conditions and the market, as promised, Commonwealth determined the Programs' interest rates based on a desire to increase its revenues at the expense of its customers. Commonwealth took the vast majority of the increased interest the Program Banks were willing to pay for its customer's swept cash in the form of Program fees that far exceeded appropriate market-based fees. Moreover, these Program Fees were duplicative of the additional advisory fees Commonwealth takes for itself on the Program Deposits.

95. Further, as discussed above, under the Sweep Program Disclosure, Commonwealth owed all customers enrolled in the Programs contractual duties, including those under the implied covenant of good faith and fair dealing, which precluded Commonwealth from acting in a manner that frustrates the purpose of its contracts with its customers' or violating its customers reasonable expectations under their contract with Commonwealth. Commonwealth violated these duties when it abused its discretion by paying customers interest rates under the Programs that were well below several objective benchmarks, which climbed as the Program interest rates remained largely static and in some cases declined.

### D. Commonwealth Actively Discouraged Customers from Pursuing Better Investment Options for their Swept Cash

96. Notably, while the rates offered through the Programs did not track prevailing economic and business conditions and the market, interest rates provided by Commonwealth's

market competitors who swept their customers' cash into money market funds were far higher and more closely tracked economic and business conditions and the market.

97. For example, the following chart compares the rates Plaintiff receives from Commonwealth's Programs, as of June 18, 2026, with those of Fidelity which sweeps its customers cash into SPAXX, a money market fund:

| BDSP | ARSP | Fidelity |
|---|---|---|
| 0.15% (Tier 2) | 0.01% | 3.28% |

98. This shows that other financial institutions offer money market funds as a vehicle for sweeping cash and pay or secure significantly higher rates than Commonwealth—in some instances, even more than 328 times higher.

99. The rates offered by money market funds have been substantially higher that the BDSP and ARSP rates throughout the relevant time period as shown below:




100. Yet, despite the fact that using a money market fund would have provided a significantly higher return for Plaintiff and Class members' free credit balances, Commonwealth actively discouraged Plaintiff and Class members from sweeping their cash into a money market fund.

101. Specifically, Commonwealth told Plaintiff and Class members that they could contact their "financial advisor to discuss other options that are available outside the Program[s] . . . including but not limited to, money market funds" but went on to tell Plaintiff and members of the Classes that "[a]lthough money market mutual funds seek to preserve a net asset value of $1 per share, there is no guarantee that this will occur; it is possible to lose money by investing in a money market mutual fund, including loss of principal."[42]

102. Commonwealth thus actively discouraged Plaintiff and Class members from sweeping their cash into money market funds even though doing so would have provided Plaintiff and members of the Classes with a higher rate of interest on their swept cash.

103. Tellingly, unlike Commonwealth does under the Programs, Commonwealth would not stand to reap the primary benefits of an investment of Plaintiff's and members of the Classes' cash in a money market fund. Thus, Commonwealth actively prioritized its own interest over that of Plaintiff's and members of the Classes' interest when it discouraged Plaintiff and members of the Classes from switching from the Programs to a money market fund.

### E. The Programs Benefit Commonwealth at the Expense of its Customers

104. Plaintiff and members of the Classes depended on, and placed their trust and confidence in Commonwealth's judgment, honesty, and integrity to select appropriate cash sweep options and to operate the Programs in their best interest. However, the Programs primarily benefit Commonwealth at the expense of Plaintiff and the Classes.

105. Commonwealth has devised a scheme by which it generates significant profits for itself using its customers' cash balances in the Programs. The scheme is devised to maximize profits for Commonwealth while disregarding its customers' best interest.

---

[42] Sweep Program Disclosure at 10.

106. Commonwealth directs all eligible accounts to the Programs which it structures, operates and maintains with total discretion. Indeed, Commonwealth holds discretion to “raise or reduce fees” and determine interest rates in the Program.[43] Commonwealth also retains the authority to “modify one or both of the Programs” at any time—a discretionary authority it chooses not to exercise in the best interest of its clients.[44] Rather than exercising this discretion to benefit Plaintiff and the members of the Classes, Commonwealth abuses its discretion in the operation of the Programs to benefit itself.

107. Commonwealth’s decision to direct all of Plaintiff’s and members’ of the Classes free credit balances to the Programs benefits Commonwealth at the expense of its customers.

*108.* Commonwealth’s scheme allows it to boost its interest income by pocketing the vast spread between the interest Program Banks are willing to pay based on prevailing economic and business conditions and the market and the paltry interest rates paid to Plaintiff and the Classes under the Programs. Commonwealth’s net revenue is heavily impacted by its net interest income.

109. Commonwealth benefits from the high interest rate environment and the way it structures its Programs by taking substantial fees, that far exceed a market-based fees, on cash held in the Programs that vastly exceed the interest paid to Commonwealth customers themselves. Accordingly, Commonwealth designed, implemented, and operated the Programs to benefit itself at the expense of its customers, which violates Commonwealth’s fiduciary, contractual, and common law duties to its customers.

110. This scheme is also facilitated by account stickiness, or, the difficulty for customers to move their assets to a new brokerage to earn a market-based sweep rate.

---

[43] *Id.* at 27.
[44] *Id.* at 25.

111. The rates paid by Commonwealth to Program Participants violate Commonwealth's contractual and fiduciary duties because these rates are based upon neither prevailing economic and business conditions nor the market and also place Commonwealth's interests ahead of its customers.

112. Commonwealth's continual sweep of Plaintiff's and the Class's cash into the Programs constitutes a continuing wrong and is a continuing breach of Commonwealth's duties to Plaintiff and the Class. Each time Commonwealth places Plaintiff's and the Class's cash into the Programs and pays a non-market-based interest rate, Commonwealth newly injures Plaintiff and the Class members.

## V. TOLLING

113. The extent to which Commonwealth acted in its own interest and prioritized its return at the expense of its customers was actively concealed by Commonwealth. Neither Plaintiff nor members of the Classes could have discovered through reasonable diligence that Commonwealth was actively structuring and operating the Programs to benefit itself at its customers' expense.

114. Indeed, the earliest date on which the Plaintiff and members of the Classes could reasonably have been on notice of Commonwealth's illicit behavior was January 2025 when the Securities and Exchange Commission made headlines by settling charges against other brokerages, such as Merrill Lynch and Wells Fargo, arising out of the manner in which they operated and offered sweep programs to customers.

115. Any applicable statutes of limitations have been tolled by Commonwealth's knowing and active concealment of the facts alleged herein.

116. Plaintiff and members of the Classes have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and members of the classes could not reasonably have discovered the nature of Commonwealth's conduct. Accordingly, Commonwealth is estopped from relying on any statute of limitations to defeat any of the claims of Plaintiff and the members of the Classes.

## VI. CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and (b)(3) on behalf of the following Classes (the "Classes"):

a. **Nationwide BDSP Class:** All customers residing in the United States and holding Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Bank Deposit Sweep Program.

b. **Nationwide ARSP Class:** All customers residing in the United States and holding Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Advisory Retirement Sweep Program.

c. **Brokerage Sub-Class:** All customers residing in the United States and holding non-discretionary Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Bank Deposit Sweep Program.

d. **Advisory BDSP Sub-Class:** All customers residing in the United States and holding advisory Commonwealth investment accounts whose free

credit balances have been placed in deposit accounts as part of the Bank Deposit Sweep Program.

e. **Advisory ARSP Sub-Class:** All customers residing in the United States and holding advisory Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Advisory Retirement Sweep Program.

f. **Current Customer Sub-Class**: All customers residing in the United States and currently holding Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Bank Deposit Sweep Program or Advisory Retirement Sweep Program.

g. **Kentucky Sub-Class**: All customers residing in Kentucky and holding Commonwealth investment accounts whose free credit balances have been placed in deposit accounts as part of the Bank Deposit Sweep Program or Advisory Retirement Sweep Program.

118. Excluded from the Classes are Defendant and its parents, subsidiaries, and corporate affiliates, and governmental entities. Plaintiff reserves the right to revise the definition of the Classes and reserves the right to establish additional Sub-Classes where appropriate.

119. Members of the Classes are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. Plaintiff believes that there are at least tens of thousands of proposed members of the Classes throughout the United States. The Classes may be identified from Defendant’s business records.

120. Common questions of law and fact exist as to all the Class members and predominate over any issues solely affecting individual Class members. The common and predominating questions of law and fact, each of which may also be certified under Rule 23(c)(4), include, but are not limited to:

a. Whether Commonwealth owed fiduciary duties to Plaintiff and the Advisory BDSP and Advisory ARSP Sub-Classes in connection with the Programs;

b. Whether Commonwealth breached its contracts with Plaintiff and the Classes regarding the Programs;

c. Whether Commonwealth breached the implied covenant of good faith and fair dealing with Plaintiff and the Classes regarding the Programs;

d. Whether Commonwealth violated Mass. Gen. Law ch. 93A §§ 2 and 9, in connection with the Programs;

e. Whether Commonwealth violated KRS § 367.170 in connection with the Programs;

f. Whether the Programs unjustly enriched Commonwealth; and

g. Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

121. Plaintiff's claims are typical of the claims of the Classes that Plaintiff seeks to represent. As alleged herein, Plaintiff and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendant.

122. Plaintiff is willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect

the interests of the Classes and has no interests adverse to or in conflict with the interests of the Classes.

123. Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiff will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

124. Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex class action litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent Class members.

125. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

126. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

127. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

128. The Classes may also be certified under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

129. The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

130. The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII. CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (on Behalf of Plaintiff, the BDSP Advisory Sub-Class and the ARSP Advisory Sub-Class)

131. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

132. Plaintiff brings this cause of action individually and on behalf of all members of the BDSP Advisory Sub-Class and the ARSP Advisory Sub-Class against Commonwealth.

133. At all relevant times, Commonwealth owed fiduciary duties to Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class in connection with their accounts. Such duties arose out of the contractual duties and common law duties Commonwealth owed to Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class.

134. Moreover, in its Investor Disclosure Brochure, Commonwealth promises Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class, under the heading "Investment

Adviser Capacity," that "[w]hen we act as an investment adviser to you, we have a fiduciary relationship with you under the Investment Advisers Act of 1940."[45]

135. Thus, Commonwealth is a fiduciary pursuant to its contractual agreements with Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class members.

136. As a fiduciary to Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class members, at all relevant times, Commonwealth's duties included, but were not limited to:

a. a duty of undivided loyalty;

b. a duty to act in the best interests of its clients;

c. a duty of care;

d. a duty not to place Commonwealth's interests above those of its clients;

e. a duty to avoid conflicts of interest; and

f. a duty to disclose any conflicts of interest.

137. Commonwealth breached the foregoing duties when it: (1) failed to act in the best interest of Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class, by failing to implement reasonably designed policies and procedures concerning the allocation of client funds in the Programs; and (2) designed, operated, structured, and implemented cash sweep programs in a manner which benefitted itself at the expense of Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class.

138. Specifically, Commonwealth failed to act in Plaintiff, the BDSP Advisory Sub-Class, and the ARSP Advisory Sub-Class's best interest by securing interest rates based on

---

[45] *Investor Disclosure Brochure* at 3, Commonwealth (April 2026), https://assets.ctfassets.net/a320zjmb1inn/7r5889vHA5nwGDf3NsCmK7/3b97cc9d0cea94ba36ab2a13723fba17/Investor_Disclosure_Brochure_4.26.pdf.

prevailing economic and business conditions and the market and instead, acted in a self-serving manner to divert its customers' cash to low-yielding deposit accounts so that Commonwealth could reap the benefits of increasing interest rates for itself at its customers' expense.

139. Commonwealth further breached its fiduciary duties to Plaintiff, the BDSP Advisory Sub-Class members, and the ARSP Advisory Sub-Class when it specifically recommended that they utilize and continue to utilize the Programs and discouraged Plaintiff and Class members from departing from the Programs for higher interest earning money market funds by advising that "[a]lthough money market funds seek to preserve a net asset value of $1 per share, there is no guarantee that this will occur; it is possible to lose money by investing in a money market funds, including loss of principal."[46]

140. Commonwealth made these representations despite the fact that Plaintiff, the BDSP Advisory Sub-Class members, and the ARSP Advisory Sub-Class members would have earned substantially more interest if their cash had been swept into a money market fund. Indeed, throughout the relevant period and currently, Commonwealth's market competitors that offer cash sweep programs that invest their clients' money into money market funds are providing interest rates that are substantially higher than the interest rates being earned in the Programs. In making these representations to Plaintiff, the BDSP Advisory Sub-Class members, and the ARSP Advisory Sub-Class members, Commonwealth prioritized its own interest in reaping substantial profits from the Programs over the interest of Plaintiff, the BDSP Advisory Sub-Class members, and the ARSP Advisory Sub-Class members who stood to earn far less interest if their cash was invested in the Programs instead of a money market fund.

---

[46] Sweep Disclosure Agreement at 10.

141. As a direct and proximate consequence of Commonwealth's conduct as alleged herein, Plaintiff, the BDSP Advisory Sub-Class members, and the ARSP Advisory Sub-Class members suffered damages.

142. Plaintiff, individually and on behalf of the BDSP Advisory Sub-Class members and the ARSP Advisory Sub-Class members, seeks all relief permitted by law, including but not limited to compensatory damages, disgorgement, restitution, forfeiture of compensation, as well as all other equitable relief deemed just and proper.

**COUNT II**
**Breach of Contract**
**(on Behalf of Plaintiff and All Classes)**

143. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

144. Plaintiff brings this cause of action individually and on behalf of all members of the Classes against Commonwealth.

145. Plaintiff and the Class members entered into valid written contracts with Commonwealth—the terms of which are contained in and incorporated into various standardized documents drafted by Commonwealth, i.e., the Account Agreements. These documents were and are, for all purposes relevant hereto, contracts between customers and Commonwealth.

**Offer and Acceptance**

146. Under the Account Agreements, Commonwealth offers to invest its customers' free credit balances into its Programs.

147. To use the Programs, Commonwealth required Plaintiff and the Class members to accept and consent to the Account Agreements, including the Sweep Program Disclosures.

**Consideration**

148. In consideration for accepting the Account Agreements and "[i]n return for providing these features," Plaintiff and Class members agreed that "Commonwealth also benefits financially from the Programs."[47]

149. Plaintiff and Class members provided valuable consideration to Commonwealth by permitting Commonwealth to broker and manage their free credit balances and by choosing to not opt-out of the Programs.

**Performance**

150. Plaintiff and Class members performed under the Account Agreements.

**Commonwealth Breached the Account Agreements**

151. In the Sweep Program Disclosure, Commonwealth promised that the interest rates for all customers under the Programs would "vary based on prevailing economic and business conditions."[48]

152. Yet the interest rates provided by Commonwealth did not track improving interest rate conditions, including the skyrocketing federal funds rate, and did not vary with benchmark interest rates, but instead remained largely static. Rather, as follows, the Program interest rates were determined based on Commonwealth's motivation to earn profits at the expense of its customers in breach of its contractual obligations regarding how Program interest rates would be set.

153. Regarding the Bank Deposit Sweep Program, the interest rates provided under the BDSP neither varied with nor were based on prevailing economic and business conditions. Rather, interest rates under the BDSP remained largely stagnant while economic and business conditions

[47] *Id.* at 7.
[48] *Id.* at 10.

as reflected by relevant benchmarks such as the FFER, FFTR, short-term U.S. Treasury Rates, and rates offered by competitors on swept cash rose.

154. Indeed, from February of 2022 until July of 2023, the FFER moved in an upward direction thirteen times. At the same time, the BDSP rate Plaintiff Weyler received (which tracks the rates received by similarly situated Class members) increased just five times and in minimal ways divorced from the market. From February of 2022 through May of 2022, when the FFER increased ten-fold, Plaintiff Weyler's BDSP rate did not move at all. Nor did his rate move between March and July of 2023 when the FFER moved 50 basis points to a fifteen-year high of 5.33%. Moreover, the rates received by Plaintiff Weyler paled in comparison to other skyrocketing rates. For instance, when the FFER reached a high of 5.33% Plaintiff Weyler's BDSP interest rate remained at 0.75%.

155. Plaintiff Weyler's BDSP interest rate also trailed far beyond other benchmarks such as the FFTR, the 1-Month U.S. Treasury, and rates offered by competitors like Vanguard on swept cash.

156. Ultimately, Plaintiff Weyler's BDSP rates (which tracks BDSP rates received by similarly situated Class members) remained largely static and below market during the entire relevant time period ranging from a low of 0.01% to a high of 0.75% even as rates like the FFER, which started at 0.08%, reached as high as 5.33%. And still today, Plaintiff Weyler's BDSP rate sits at just 0.15% even as the FFER remains at 3.63% and the FFTR remains at 3.75%.

157. By keeping BDSP rates below market and largely static at a time of rapidly increasing and high interest rates, Commonwealth breached its contractual promise that interest rates would "vary based upon prevailing economic and business conditions."[49]

[49] Sweep Program Disclosure at 10.

158. Regarding the Advisory Retirement Sweep Program, the interest rates provided under the ARSP also did not track or vary based on prevailing economic and business conditions. In fact, the ARSP at times moved *in the opposite direction* of such economic and business conditions as FFER, short-term U.S. Treasury Rates, and sweep program competitor rates. Nor was the ARSP rate based on those same conditions where, at all relevant times, the ARSP rate provided by Commonwealth remained a mere fraction thereof.

159. Indeed, while the FFER moved in an upward direction thirteen times between March 2022 and November 2025, the ARSP rate moved in an upward direction only eight times and increased in minimal ways divorced from the market and, in fact, moved down four times when the FFER rate increased.

160. The ARSP interest rate also trailed far beyond other benchmarks such as the FFTR, the 1-Month U.S. Treasury, and rates offered by competitors like Vanguard on swept cash.

161. Ultimately, ARSP rates remained largely static and below market during the entire relevant time period ranging from only 0.01% to 2.37% even as other rates like the FFER moved from a low of 0.08% to a peak of 5.33%.

162. By keeping ARSP rates below market and largely static at a time of rapidly increasing and high interest rates, Commonwealth breached its contractual promise that interest rates would "vary based upon prevailing economic and business conditions."[50]

163. Instead, interest rates on Plaintiff's and Class Members' cash invested in the Programs were determined based on Commonwealth's motivation to earn profits at the expense of its customers. As such, Commonwealth denied Plaintiff and Class members the full benefit of their bargain under the Sweep Program Disclosure.

[50] Sweep Program Disclosure at 10.

164. As a direct and proximate result of Commonwealth's breaches of contract, Plaintiff and Class members sustained damages.

165. Plaintiff and Class members seek all relief permitted by law including, but not limited to, compensatory damages.

**COUNT III**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(on Behalf of Plaintiff and All Classes)**

166. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

167. Plaintiff brings this cause of action individually and on behalf of all members of the Classes against Commonwealth.

168. Plaintiff and Class members entered into written contracts with Commonwealth—the terms of which are contained in and incorporated into various standardized Account Agreements drafted by Commonwealth. These documents were and are, for all purposes relevant hereto, contracts between customers and Commonwealth.

169. Plaintiff and Class members paid valuable consideration in exchange for these contractual rights.

170. Inherent in these contracts were and are duties of good faith and fair dealing that prevents Commonwealth from acting in a manner that frustrates the purpose of the Programs or violates its customers' reasonable expectations under the Sweep Program Disclosure.

171. The stated purpose of the Programs is for Program Participants to earn interest "based on economic circumstances."[51]

[51] Sweep Program Disclosure at 6.

172. Moreover, because Commonwealth (1) stated that the Programs were designed to provide interest to customers, (2) told customers that the interest earned in the Programs would benefit customers financially, (3) promised that the interest rate provided would “vary based on prevailing economic and business conditions” and (4) told customers that interest rates would be impacted by such conditions as FFER, Plaintiff and similarly situated Commonwealth customers had a reasonable expectation that Commonwealth would provide interest on their swept cash that would vary with and track the trajectory of the market.[52]

173. Defendant frustrated the purpose of the Programs and violated Plaintiff and Class members’ reasonable expectations under the Account Agreements, thereby breaching its duties of good faith and fair dealing, by failing to provide Plaintiff and Class members with interest rates on their cash deposits in the Programs which varied with and tracked the trajectory of the market and by taking the lion’s share of interest earned via the Programs for itself.

174. Indeed, the interest rates provided by Commonwealth under the Programs were well below several objective economic benchmarks, including the FFER, which increased dramatically while the interest rates in the Programs remained largely flat and/or varied in a manner and amounts that were wholly disconnected from the market.

175. Further, Commonwealth acted in its own self-interest and took the majority of interest earned on Plaintiff’s and Class members’ cash for itself. As such, Commonwealth acted with a lack of good faith and, in doing so, denied Plaintiff and Class members the full benefit of their bargain under their contracts with Commonwealth.

176. Plaintiff and Class members suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing.

---

[52] *Id.* at 10.

177. Plaintiff and Class members seek all relief permitted by law including, but not limited to, compensatory damages.

**COUNT IV**
**Violation of Mass. Gen. Law ch. 93A, §§ 2 and 9**
**(on Behalf of Plaintiff and the Nationwide BDSP Class, Nationwide ARSP Class or alternatively on behalf of the Brokerage Sub-Class, Advisory BDSP Sub-Class, and Advisory ARSP Sub-Class)**

178. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

179. Plaintiff brings this cause of action individually and on behalf of all members of the Nationwide BDSP Class, Nationwide ARSP Class, or alternatively, the Brokerage Sub-Class, Advisory BDSP Sub-Class, and Advisory ARSP Sub-Class against Commonwealth.

180. Both Plaintiff and Commonwealth are "persons" as defined in Mass. Gen. Laws ch. 93A, § 1(a).

181. Commonwealth's dealings with Plaintiff and Class members, as described herein, constitute "trade" and "commerce" under Mass. Gen. Laws ch. 93A, § 1(b).

182. Section 2(a) of Mass. Gen. Laws ch. 93A (the "Massachusetts Consumer Protection Law") proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce."

183. Under Mass. Gen. Laws ch. 93A § 2(c), the Massachusetts Attorney General is empowered to make rules and regulations defining the "unfair or deceptive acts or practices" that violate §2(a). One such regulation, among others, provides that an "act or practice is a violation of [ch. 93A] if … [a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 Mass. Reg. § 3.16.

184. Ch. 93A, § 11 provides a right of action to any person engaged in trade or commerce who suffers a loss of money or property from another person's use, in trade or commerce, of an unfair method of competition or an unfair or deceptive act or practice.

185. All of Commonwealth's officers are located in Waltham, Massachusetts and all decisions, pertaining to the Programs and otherwise, are made in Waltham, Massachusetts, including the drafting of all relevant agreements and the Programs' operational, executive, administrative and policymaking decisions.

186. The parties also entered into their agreement for Commonwealth to invest Plaintiff's and Class members'[53] free credit balances in Massachusetts as this is where Commonwealth drafted the Account Agreements, including the Sweep Program Disclosure and is the place from which Commonwealth offered these services to Plaintiff and Class members.

187. Commonwealth's acts and practices, as alleged herein, are unfair and deceptive.

188. Indeed, Commonwealth provided unfair interest rates in contravention of its customers' reasonable expectations, which were based on Commonwealth's misleading and/or deceptive representations regarding how interest rates would be set (i.e., based on economic and business conditions and the market) and omissions and the purpose of the Programs to provide customers with interest on their cash and to financially benefit customers. Thus, Commonwealth contravened Plaintiff and Class members' reasonable expectation that as the interest rate environment improved, they would receive interest rates on the swept cash that tracked and reflected those improving interest rates.

[53] In this instance, Class members refers to members of the Nationwide BDSP Class, Nationwide ARSP Class, or alternatively, the Brokerage Sub-Class, Advisory BDSP Sub-Class, and Advisory ARSP Sub-Class.

189. Commonwealth also falsely represented that Plaintiff and Class members would receive interest rates on cash held in the Programs that would vary based on prevailing economic and business conditions and the market but, in truth, structured the Programs so that Commonwealth and not its customers would benefit from the increased interest rates being offered by Program Banks during a time of skyrocketing interest rates.

190. Commonwealth also omitted that it put its own interest above the interest of its customers by structuring the Programs so that Commonwealth could reap the vast majority of the increased interest rates Program Banks were willing to pay on Commonwealth's customers' swept cash by taking a fee for itself that was substantially higher than a market-based fee and providing interest rates to Program Participants that were divorced from the market.

191. Commonwealth's conduct was unfair and Commonwealth's representations and omissions regarding the Program were misleading and/or deceptive.

192. Ultimately, Commonwealth unfairly and unethically set interest rates in the Programs at incredibly low rates that were untethered to the market to capitalize on favorable conditions to enrich itself at its customers' expense through interest earned on its customers' cash.

193. Commonwealth also acted deceptively by misleadingly claiming to base rates on prevailing economic and business conditions and holding rates steady even when market indicators like the FFER went up. Commonwealth did this to increase the spread between the rates Program Banks pay and the rates it paid customers—and take the spread for itself.

194. Commonwealth further actively discouraged it customers from opting out of the Programs and investing their free credit balances into money market funds despite the fact that Plaintiff and Class members would have received substantially higher interest rates if their cash was invested in a money market fund.

195. Commonwealth also collected duplicative fees by assessing fees on the same cash under both the Programs and management/other asset-based fees.

196. Commonwealth provided customers in the Programs with paltry interest rates that are neither suitable given economic and business conditions and the market nor in their customer's best interest.

197. Commonwealth's conduct violated common-law and/or other established concepts of fairness and was unethical or unscrupulous.

198. Plaintiff and Class members have been and continue to be injured as a direct and proximate result of Commonwealth's violations of the Massachusetts Consumer Protection Law where they have received interest rates in the Programs far less than what they were entitled to. Further, Plaintiff and the Class members[54] have unfairly been charged duplicative fees.

199. Commonwealth knew or should have known that its conduct violated the Massachusetts Consumer Protection Law.

200. In accordance with Mass. Gen. Laws ch. 93A, § 9(3), Plaintiff delivered a written demand for relief upon Commonwealth, describing Commonwealth's unfair and deceptive acts, the injury he and other Commonwealth customers have suffered, and demanding that Commonwealth cease its unlawful conduct on June 18, 2026. This demand letter was sent to Commonwealth more than 30 days before the stipulated due date for Commonwealth's answer to Plaintiff's initial complaint. Commonwealth has failed to remedy its unlawful conduct within the requisite time period.

[54] In this instance, Class members refers to members of the Nationwide BDSP Class, Nationwide ARSP Class, or alternatively, the Brokerage Sub-Class, Advisory BDSP Sub-Class, and Advisory ARSP Sub-Class.

201. Plaintiff and Class members seek all relief permitted by law including, but not limited to, compensatory damages, statutory damages, treble damages, equitable relief, attorneys' fees, interest, and costs.

**COUNT V**
**Violation of Kentucky's Consumer Protection Act (KRS § 367.170)**
**(on Behalf of Plaintiff and Kentucky Sub-Class)**

202. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

203. Plaintiff brings this cause of action individually and on behalf of all members of the Kentucky Sub-Class against Commonwealth.

204. Commonwealth's dealings with Plaintiff and Class members, as described herein, constitute "commerce" under Ky. Rev. Stat. Ann. § 367.170.

205. At all relevant times, Commonwealth engaged in unfair acts and practices when it intentionally provided an interest rate under the BDSP and ARSP which neither varied with nor was based upon prevailing economic and business conditions and the market as was promised under the Account Agreements, thereby depriving Plaintiff and the Kentucky Sub-Class of the benefit of their bargain.

206. Commonwealth is also able to achieve this result by function of its superior resources and bargaining power. In particular, Commonwealth benefited from the account stickiness, or, the difficulty for customers to move their assets to a new brokerage to earn a market-based sweep rate

207. As a result of this imbalance of resources and bargaining power, Commonwealth was able to extract fees several hundred times the interest rates passed along to customers, which far exceeded an appropriate market-based fee.

208. As a result of Commonwealth's conduct, Plaintiff and the Kentucky Sub-Class incurred damages in the form of the difference in interest between the rate they should have received under the Programs and the rate they actually received.

209. Commonwealth's conduct occurred in the course of offering a commercial service to Plaintiff and members of the Kentucky Sub-Class.

210. Plaintiff and the Kentucky Sub-Class enrolled in the Programs for personal, family, or household purposes.

211. Plaintiff and the Kentucky Sub-Class members seek all relief permitted by law including, but not limited to, actual damages, equitable relief, punitive damages, reasonable costs and attorney's fees.

**COUNT VI**
**Unjust Enrichment**
**(In the Alternative)**
**(on Behalf of Plaintiff and All Classes)**

212. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

213. Plaintiff brings this cause of action individually and on behalf of all members of the Classes against Commonwealth.

214. As a result of Commonwealth's wrongful conduct, Plaintiff and the Classes received paltry interest rates on the cash enrolled in the Programs, while Commonwealth collected an outsized share of the interest earned on Plaintiff's and the Classes' cash in the Programs

215. As a result of Commonwealth's wrongful conduct, Commonwealth was unjustly enriched because, among other benefits, it took significantly higher fees than it would have but for their wrongful conduct. Commonwealth's unjust enrichment was at Plaintiff and Class members' expense.

216. Further, Commonwealth was unjustly enriched where it collected both advisory fees and fees under the Programs on the same cash balances. Commonwealth did so despite already being obligated to act in its customers' best interests under its fiduciary obligations.

217. Commonwealth appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the Classes.

218. Plaintiff and the Classes lack an adequate remedy at law to rectify Commonwealth's conduct.

219. It would be inequitable, unjust, and against good conscience to permit Commonwealth to retain these wrongfully obtained profits.

220. Commonwealth's retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

221. Plaintiff and Class members seek all relief permitted by law including, but not limited to, equitable restitution and disgorgement.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiff and the Classes, and award the following relief:

a. An order certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes, and Plaintiff's counsel as counsel for the Classes;

b. Appropriate injunctive and equitable relief;

c. A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

d. An order awarding costs, restitution, disgorgement, forfeiture of compensation, punitive damages, statutory damages, treble damages, and exemplary damages under applicable law, and compensatory damages for economic loss, and out-of-pocket costs in an amount to be determined at trial;

e. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

f. An award of costs, expenses, and attorneys' fees as permitted by law; and

g. Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

DATED: July 24, 2026

Respectfully submitted,

*/s/ Melissa L. Yeates*

Joseph H. Meltzer (appearance *pro hac vice*)
Melissa L. Yeates (appearance *pro hac vice*)
Jordan E. Jacobson (appearance *pro hac vice*)
Daniel S. Dicce (appearance *pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
jjacobson@ktmc.com
ddicce@ktmc.com

-and–

Ferenc Karoly (BBO #690623)
**LYNCH & PINE**
One Park Row, 5th Floor
Providence, Rhode Island 02903

Telephone: (401) 274-3306
fkaroly@lynchpine.com

-and-

James E. Cecchi (appearance *pro hac vice*)
Kevin G. Cooper (appearance *pro hac vice*)
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C**.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2026, I electronically filed the foregoing document through the Court's ECF system, which sent notice of the filing to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Melissa L. Yeates*
Melissa L. Yeates